# THE MAYOR AND CITY COUNCIL OF BALTIMORE, a Municipal Corporation,

## vs.

## MOSES L. HIMMEL et al.

*Condemnation Proceedings—Structural and Reproduction Value —Buildings and Fixtures.*

In condemnation proceedings, structural or reproduction value of the buildings involved, with due allowance for depreciation, is admissible in evidence to show market value, provided the buildings are well adapted to the land and its surroundings, and their structural value represents a fairly proportionate enhancement of the market value of the land. p. 70

Buildings and fixtures are parts of the realty and as such must be considered and allowed for, in condemnation proceedings, to the extent that they enhance the value of the land. p. 71

Where fixtures become part of the realty, if the land on which the building stands is taken as a whole or in part for public use, the owner is entitled to have the fixtures considered in determining the amount of his compensation. p. 71

An instruction that, in arriving at the fair market value of the property condemned, the jury might consider the present structural value of the buildings on the land, with a due allowance for depreciation, provided they find that the buildings are well adapted to the land and surroundings and enhance the market value of the land in an amount fairly proportionate to the structural value of the buildings, *held* erroneous, as failing to state that the jury should award the fair market value of the land at the time of condemnation as enhanced by the buildings thereon. p. 73

An instruction that articles found to be fixtures may be considered as part of the land and buildings in estimating the damages was defective in failing to state that the jury should award to the owners the present fair market value of the land taken, as enhanced by the buildings and fixtures thereon. p. 74

Machinery, shafting, engines, boilers, and other articles and appliances, actually annexed to the buildings or land, with the intention that they remain permanently for use in connection with such buildings and land, and essential to the purposes for

which the buildings and land are being used, are fixtures, and are to be considered as part of the land in determining its value in a condemnation proceeding.                    pp. 73, 74

In a proceeding by a city to condemn land, a city official, who testified that he had made a study of real estate for four years, and that in connection with his official duties it became necessary for him to acquaint himself with its value, that he had studied its value carefully, and had consulted the largest real estate people, was competent to testify as to the market value of property condemned, though he would not have been competent had his knowledge been based solely upon sales made with a view to obviating condemnation proceedings.                    p. 74

The assessment of property, made by public authorities for purposes of taxation, is not admissible in condemnation proceedings.                    pp. 75, 76

A statement made by a property owner to the assessor of taxes, in regard to the value of the property, for the purpose of taxation, whether or not under oath, is admissible in a proceeding to condemn the property, both to impeach the owner and as independent evidence of value.                    p. 76

*Decided June 25th, 1919.*

Appeal from the Baltimore City Court (AMBLER, J.).

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER, STOCKBRIDGE, and ADKINS, JJ.

*George Arnold Frick* and *S. S. Field,* for the appellant.

*Joseph N. Ulman* and *Edgar Allan Poe,* with whom were *Knapp, Ulman & Tucker,* and *Bartlett, Poe & Clagett,* on the brief, for the appellees.

BURKE, J., delivered the opinion of the Court.

The Mayor and City Council of Baltimore instituted proceedings for the condemnation in fee of eleven pieces of property for use in connection with the establishment by the City of a Civic Centre. A portion of the property was subject to ground rent. By their inquisition the jury found that the damages which would be sustained by the owners of the

entire property by the taking, use and occupation by the
City to be $283,500.00. The value of the ground rents
(which was fixed by agreement and about which there is no
question in this case) was found to be $15,230.00. The bal-
ance, $268,270.00, was awarded to the other owners. The
appeal before us was taken from the judgment entered on
the inquisition by the Baltimore City Court.

The property condemned is located in the block bounded
by Frederick, Lexington, Harrison and Fayette streets, and
contains about one-half of the block. Eight pieces of this
property are improved and three are unimproved. The en-
tire property condemned was used and occupied by the appel-
lees as a manufacturing plant for the manufacture of furni-
ture. The business was an old, well established and quite
an extensive one. The property is located in a manufactur-
ing section of the City, on good streets, and of easy access
to wharves and railroads. The buildings are well adapted
to the land and the locality, and are so connected up as to
enable the owners to use them all as useful and separate
units in the prosecution of their business. Expensive and
suitable machinery was installed upon the property—boilers,
engines, a sprinkler and heating system, shafting, motors, ele-
vators, electric wiring, plumbing, etc. Some of this mechan-
ical equipment was permanently attached to the soil, and
others of it could not be detached without greatly injuring it.
The evidence shows that the appellees were the owners of a
large, valuable and well equipped manufacturing plant.

For the disposition of the legal questions presented by the
record it will be sufficient to deal with the evidence accord-
ing to its general purport and effect as it relates to the ques-
tions to be decided. The method pursued by the City to
prove the present fair market value of the property taken
was this: It called competent real estate experts, who first
valued each separate piece of land, and then gave their opin-
ion as to how much the value of each lot was enhanced by the
improvements, and stated fully the reasons upon which their
valuations were based. This method of arriving at the value

of the property was made very clear from the following
extract from the testimony of Harry E. Gilbert, the first wit-
ness called by the City. After testifying to the value of each
lot as unimproved and to the amount the improvement thereon
added to each lot, he testified that: "The aggregate of his
land value is $36,835. He thought that the added value
which the improvements gave to the property was $107,150,
without reference to the sprinkling system. He considered
that the latter gave another added value of $5,500 and that
the boiler house gave an added value of $500, making the
aggregate value of the property in fee $150,230. He had
reached this conclusion through sales in the neighborhood
and had considered rentals and his knowledge of what build-
ings added to the land values, what they are worth on the
market. He had not given or attempted to give any con-
struction value of the buildings or a reproduction value.
The reason for this was that it was his experience and the
experience of every real estate man (and it is acknowledged)
that that process will not give one the value of the land plus
old buildings; because there are other things that enter into
the value of property that depreciate the property. There
is a thing that is very vital and important known as eco-
nomic depreciation, independent of structural depreciation."
Charles N. Boulden, the other real estate expert for the City,
adopted the same method of valuation, and "gave his judg-
ment as to the value of the land in each separate lot, these
figures aggregating $38,320.83, and testified that he consid-
ered the building added to the value of the property an
aggregate of $105,300, making the aggregate value of the
property $143,620.83. Deducting the value of the ground
rents, as agreed upon, $15,320, the value of the Himmel in-
terests in the property was $128,390.83. He testified that
he reached these conclusions from other sales in the neigh-
borhood in comparison with the land value and values of the
buildings on the property. Then he checked it up by com-
parison with rental value." Richard R. Pue testified that:
"He considered the fee simple value for the property $135,-

596, and that the interest of the Himmels, after deducting
the capitalization of the ground rent, to be worth $120,366.
The land value alone he considered to be $34,010. It was
his opinion that the buildings added $101,586 to the value
of the land. After an inspection of the property and a con-
sideration of its location, he compared that information with
sales of other properties, which he analyzed, and with their
rental values. And to this information he applied his experi-
ence as real estate man and reached the conclusion stated."
Neither of these witnesses placed any value on the machin-
ery or other mechanical equipment other than that mentioned
by Mr. Gilbert. These witnesses furnished the principal
evidence on the part of the City to prove the value of the
property taken. Mr. Gilbert valued the entire interest in
fee at $150,230.00; Mr. Boulden at $148,390.83, and Mr.
Pue's valuation was $135,596.00.

The landowners pursued, in one respect, a totally different
method of arriving at the fair value of the property. They
called James Carey Martien, William E. Ferguson, and
Charles H. Steffey, each competent real estate experts, and
each gave his valuation of the land embraced in the condem-
nation. Mr. Martien valued it at $72,877.00 in fee; Mr. Fer-
guson at $68,328.32; Mr. Steffey at $73,910.00. Mr. Mar-
tien and Mr. Steffey said the buildings upon the property
were well adapted to the land and the surroundings, and that
the property was being used for its highest utility. These
witnesses, although familiar with the character of the build-
ings, expressed no opinion as to the amount they added to
the value of the land, but said their structural value repre-
sented a fairly proportionate enhancement in the market
value of the land, and that the accurate or best method to de-
termine the value of the property, where it was improved as
this was to its highest utility, is to ascertain through the real
estate broker the value of the ground, and through the build-
ers the value of the improvements. The appellees then called
Otto G. Simonson, an architect of high qualifications and
wide experience in his profession, and R. B. Mason, a con-

tractor and builder of forty years' experience. Each of these witnesses was familiar with the buildings upon the land, and each testified as to the structural or reproduction value at the present time, with what they considered due allowance for depreciation. Mr. Simonson estimated the reproduction value to be $255,351.42, and Mr. Mason's valuation was $287,532.11. Other witnesses, upon the same principle, fixed a value upon the boilers, engines and other items of equipment which the appellees claimed to be fixtures.

Upon the testimony produced by the appellees, as we have outlined it, arises one of the principal questions in the case. It is this: Was evidence of structural or reproduction value, with due allowance for depreciation, admissible in this case to show market value? This question is raised by the seventh, eighth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, seventeenth, nineteenth and twentieth bills of exceptions. In *McGaw v. Baltimore,* 131 Md. 430, decided in 1917, the lower Court by an instruction directed "the jury to disregard the testimony of the appellant's witness as to the costs of constructing the building *at the present time."* This ruling was held to be reversible error. In discussing the question of the admissibility of evidence of structural value in condemnation cases the Court stated the general rule to be, "that such value may be proved, with a due allowance for depreciation, as reflecting upon the market value of the land, provided the buildings are well adapted to the land and its surroundings and their structural value represents a fairly proportionate enhancement of the market value of the land. *New York* v. *Dunn et al.,* 198 N. Y. 84, 41 L. R. A. (N. S.) 411, note; *Patch* v. *Boston,* 146 Mass. 52; *Jacksonville & S. E. Ry. Co.* v. *Walsh,* 106 Ill. 256; *Sedgwick on the Measure of Damages,* 9 Ed. Vol. 3, Sec. 1168, 10 R. C. L. Sec. 124." All the conditions justifying the admission of reproduction value under the rule laid down in that case are present in this, and unless we overrule that case we must hold that the evidence excepted to was properly admitted. It must be admitted that the decisions in other jurisdictions are not uniform

upon the question, but it is useless to discuss them if we are
prepared to adhere to our former ruling. It is contended
that the application of that rule in condemnation cases, when
the cost of construction is abnormally high, would result in
great injustice. But as to that it may be said that under any
rule that might be applied some injustice and some unfair-
ness to one or other of the parties may be found to exist.
We do not apprehend that the fears of the City will be real-
ized by the application of the rule in proper cases. What
the owners are entitled to is just compensation for the prop-
erty taken, and that was the present fair market value of the
land taken as enhanced by the buildings and fixtures upon it.
The City was condemning the land—not personal property.
The buildings and fixtures are a part of the realty, and must
be considered and allowed for to the extent that they enhance
the value of the land to which they are affixed. It is said
in 10 *R. C. L.,* Sec. 124, that: "When a piece of land upon
which buildings have been erected and affixed to the soil is
taken by eminent domain, so far as the buildings add to the
market value of the land, they must be considered in deter-
mining the compensation to be awarded to the owner; and
in determining the damage to land not taken, injury to build-
ings standing thereon must be included. When fixtures
become part of the realty, if the land on which the building
stands is taken in whole or in part for the public use, the
owner is entitled to have the fixtures considered in deter-
mining the amount of his compensation. An owner is not
entitled to have buildings or fixtures valued as separate items
additional to the market value of the land; but the issue in
each case is the market value of the land with the buildings
and fixtures upon it. The owner, therefore, receives noth-
ing for the buildings and fixtures unless they increase the
market value of the land. In the ordinary case, however, the
character of the structures is well adopted to the kind of land
upon which they are erected, and the cost of the buildings
and fixtures, after making proper deductions for deprecia-
tion by wear and tear, is a reasonable test of the amount by

which they enhance the market value of the land." In *New York* v. *Dunn et al.*, 198 N. Y. 84, 41 L. R. A. (N. S.) 411, 139 Am. St. Rep. 791, the Court said that reproduction value may be by no means a *conclusive test* as to the market value of premises condemned for public use. "But that is not the question at issue. The question is whether evidence of structural value is competent to show market value, when the buildings are suitable to the land. There are instances, of course, when precisely similar buildings upon identical parcels of land may have the same potential market value, just as the price of commodities, like cotton, flour or potatoes, is regulated by the law of supply and demand without reference to cost of production in particular cases. When that is true, the market value may be the value of the land as enhanced by the value of the buildings, without reference to structural value. But when a building has an intrinsic value, which must be added to the value of the land in order to ascertain the value of the whole, the owner may not be able to establish his just compensation unless he is permitted to prove the value of his land as land and the value of his buildings as structures. By adding to each other these two quantities, the result is really the value of the land as enhanced by the buildings thereon." We, therefore, hold that the evidence offered upon the question based upon structural value was competent to aid the jury in fixing the just compensation, as above defined, for the property taken.

The other important question arises upon the property owners' first prayer, which is as follows:

"The jury are instructed that they must award to the property owner the present fair market value of the property being condemned in this proceeding by the Mayor and City Council of Baltimore, which is the price which would be paid for such property by a buyer willing but not compelled to buy to a seller willing but not compelled to sell; *and that in arriving at said present fair market value they may take into consideration as reflecting upon the market value of the property the present structural value of the buildings upon*

*the land, with a due allowance for depreciation; provided the jury shall find that the buildings are well adapted to the land and its surroundings and that the existence of the buildings on the land enhances the market value of the land in an amount fairly proportionate to the present structural value of the buildings, with a due allowance for depreciation as aforesaid.* And if the jury shall further find that the land and buildings which are being condemned in this proceeding constitute a manufacturing plant, then they are further instructed that so much of the machinery, shafting, belting, engines, boilers, sprinklers, elevators, heating plant, heating and water pipes, plumbing, dust and shaving collectors and conveyors, fumixers and electric wiring as the jury shall find to be (1) actually annexed to the buildings or land that are being condemned, and (2) to have been so annexed with the intention of their remaining permanently for use in connection with the said buildings and land, and (3) to be essential to the purposes for which the buildings and land are being used, are fixtures and constitute a part of the buildings and land that are being condemned by the Mayor and City Council of Baltimore in this proceeding; *and may be considered as part of said land and buildings by the jury in estimating the damages to which the owners are entitled."*

The jury reported to the Court that it found "that the boiler house, equipment, blower system, fume mixers, dust chute, sprinkler system and heating plant are a part of the building and land and *due allowance* has been made in the verdict." In the first italicized part of the prayer there is incorporated the language used by this Court in passing upon the *admissibility of evidence* in the *McGaw case, supra,* but the mere use of the language of the Court did not give the jury a clear and definite understanding of how it was to be applied to the facts of the case in order to arrive at the just compensation to which the owners were entitled. This part of the prayer was dealing with land and buildings only, and, in order that the jury might be fully and certainly informed as to their duty, there should have been added that they should award to the owner the fair market value of the land

at the time of condemnation as enhanced by the buildings thereon. The last clause of the prayer relates to land, buildings and fixtures. The facts stated in the prayer, if found by the jury, under the authority of the case of the *Warren Mfg. Co. v. Baltimore City,* 119 Md. 188, would constitute the several items mentioned fixtures, but, for the reasons herein expressed, there was error in that clause. The clause should have been substantially as follows: And may be considered as part of said land and buildings, and the jury are instructed to award the owners the present fair market value of the land taken as enhanced by the buildings and fixtures thereon. Under this clause of the prayer, the jury were at liberty to value such separate items as they found to be fixtures and include the amount in their finding, and this they in fact did as appears by their report accompanying the inquisition. The value of these items, as testified to by witness for the owners, was in excess of $20,000.00. It, therefore, appears that substantial error resulted from this clause of the prayer.

In the third exception, it appears that John H. Robinette, the President of the Commissioners for Opening Streets, after stating his knowledge of real estate and its values, was permitted over the objection of the appellees to testify to the market value of the property condemned. He fixed this value in fee at $152,161.00. The Court subsequently struck out his valuation upon the ground that he was not competent to testify as to values, because his knowledge of real estate values was based upon purchases made by the City. If his knowledge was based solely upon sales made with a view of obviating condemnation proceedings, he was not a competent witness to testify to values in this case. *Bonaparte v. Baltimore,* 131 Md. 80; *Lewis on Eminent Domain,* 2nd Ed., Sec. 447. But we are not satisfied that this was the case. He testified that he had made a study of real estate for four years, and that in connection with his duties it became necessary for him to acquaint himself with its value; that he had studied its value carefully and had consulted the largest real estate people. This was sufficient to have given the witness

a special knowledge upon the subject independent of sales made in view of condemnation cases. In *Swan and Others* v. *Middlesex,* 101 Mass. 173, the Court said: "The knowledge requisite to qualify a witness to testify to his opinion of the value of lands may either be acquired by the performance of official duty, as by a County Commissioner or Selectman, whose duty it is to lay out public ways, or by an assessor, whose duty it is to ascertain the value of lands for purpose of taxation, or it may be derived from knowledge of sales by the witness himself or by other persons." See also *Rogers on Expert Testimony,* Sec. 155, and *Baltimore City* v. *Hurlock,* 113 Md. 674.

The fourth and twenty-second bills of exceptions present the question of the admissibility of assessment returns made by M. L. Himmel, one of the owners and a member of the firm of M. L. Himmel & Son, to the Appeal Tax Court, in which he stated the full market value of the property which it is proposed to take in this proceeding. The statement was not under oath. The returns were made in 1915. In response to a question by the Court, counsel for the City stated: That he proposed to show what the owner of the property stated to be the value of the buildings, the value of the improvements and the other facts mentioned in the statements relative to the assessments. He offered their statements as to the original cost of the buildings, the expenditure upon the same and their statement as to the value of the property at the time the same was made, as admissions against the interests of the defendants to this proceeding. He proposed also to show that in consequence of those statements the Appeal Tax Court made certain changes in the assessments. It is proved that the papers were part of the records of Appeal Tax Court, and that one of the owners had made them himself. It had been previously testified that in consequence of the statement as to one of the buildings the assessment on it had been reduced. The appellees objected to this offer and the Court refused to admit the statements in evidence, and this ruling constitutes the twenty-second exception. The general rule is well settled that the assessment of property made by public

authorities for purposes of taxation is not admissible in con-
demnation proceedings, and it may be said that it is equally
well settled, as a general proposition, that the sworn return
made by the owner to the assessor showing the value of the
property is admissible both to impeach the owner and as
*independent evidence of value.* The assessments were not
offered, nor was the return sworn to, and neither of the own-
ers testified as to values. The question, therefore, raised by
these exceptions is: Are these unsworn returns as to value of
the property admissible as independent evidence? There is
a diversity of decisions upon the question. In *Lowell* v. *The
City of Lowell,* 73 Mass. 100, and in *St. Louis, O. H. & C.
R. R. Co.* v. *Fowler,* 142 Mo. 670, it was held that such
unsworn statements were admissible as independent evidence.
It was held otherwise in *Virginia & Truckee R. R. Co.* v.
*Henry,* 8 Nev. 165, and some other cases. We do not see,
upon the question of admissibility, why a distinction should
be made between sworn and unsworn statements. The fact
that the statement was sworn to may affect the weight to be
given to it, but, as both are admissions or declarations of the
owner as to the market value of the property, we see no good
reason why both should not be admitted. The valuation is
not conclusive, and its weight must depend upon all the facts
and circumstances and changed conditions existing at the
time of the taking. The case of *Gossage* v. *Phil., B. & W.
R. Co.,* 101 Md. 698, is an authority for holding these returns
to be admissible.

We have carefully considered the other exceptions in the
record; and, without discussing them, it will be sufficient to
say that we find no error in any of them. The City's sixth
and seventh prayers were properly refused, because they do
not, upon the facts of this case, state the law as to fixtures in
accordance with the decision in the case of the *Warren Manu-
facturing Co.* v. *Baltimore City, supra.* For errors commit-
ted in the rulings embraced in the third, fourth and twenty-
second exceptions, and in the granting of the owners' first
prayer, the rulings must be reversed.

> *Rulings reversed, with costs, and new trial
> awarded.*