884 A.2d 770

Fotis ZOGRAFOS, et al.

v.

MAYOR AND CITY COUNCIL OF BALTIMORE.

No. 1048, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Oct. 7, 2005.

Douglas N. Silber (Kelly Bollinger Burke, on the brief), Towson, for Appellants.

Andrew G. Bailey, Elva E. Tillman (Ralph S. Tyler, City Sol., on the brief), Baltimore, for Appellee.

Panel: DEBORAH S. EYLER, BARBERA and WILLIAM W. WENNER, (Retired, specially assigned), JJ.

BARBERA, Judge.

This appeal arises from the filing of a "quick-take" condemnation petition in the Circuit Court for Baltimore City by appellee, the Mayor and City Council of Baltimore (the "City"), pursuant to § 21–16 of the Code of Public Local Laws of Baltimore City ("CPLBC").[1] In the petition, the City condemned a portion of waterfront property located in the

---

1. CPLBC § 21–16 is titled, " **'Quick-take' condemnation—in general.**" Subsection (a) of that section provides that, when the City institutes a proceeding for the taking of private property for public use, it "may file a Petition under oath stating that it is necessary for the City to have immediate possession of, or immediate title to and possession of, said property, and the reasons therefore."

"Fells Point" section of Baltimore City, also known as Miller's Pier and Jackson's Wharf ("the Property"). The Property had been owned by appellants, Fotis Zografos, *et al.*[2]

The City paid into the registry of the court the sum of $260,000.00, representing the higher of two appraisals of fair market value the City had obtained. The case proceeded to trial. A jury found the fair market value of the Property to be $300,000.00, and returned an inquisition in that amount.

Appellants noted this timely appeal and present the following questions for our review, which we have reordered:

1. Whether the circuit court erred as a matter of law when it ignored the express language of Maryland Code (1974, 2003 Repl. Vol.), § 12–105(b) and (c) of the Real Property Article ("RP"), and refused to admit evidence of the State tax assessments issued December, 1987 (effective July 1, 1988), and January, 2003 (effective July 1, 2003), even though each assessed value was substantially greater than the appraised value placed on the [P]roperty by the City.

2. Whether the circuit court erred as a matter of law when it admitted testimony of a City witness, and refused to strike the opinions of the City's two appraisers after each testified that the highest and best use of the [P]roperty was affected by the public project, thereby allowing the jury to consider evidence of value based upon the effect of the taking involved.

3. Whether the circuit court erred as a matter of law when it refused to instruct the jury that, in determining the highest and best use of the [P]roperty, and in settling upon the fair market value of that property, they were to assume that [ ] Ordinance [89–412] had not been enacted, and to ignore the associated restrictions precluding any development but a public park.

---

**2.** The other appellants include Juliet S. Sackleh, Polyxeni Pentakalos, Kosmas Ioannis Pentakalos, Odysseas Ioannis Pentakalos, and Themistoklis Ioannis Pentakalos, each of whom was named as a party defendant in the City's condemnation petition.

We conclude that the circuit court committed prejudicial error when it refused to permit appellants to introduce the 1988 tax assessment as evidence of a diminution in the value of the Property caused by the 1989 ordinance authorizing the taking of it. We therefore shall vacate the judgment on that basis and remand for a new trial. We shall address the remaining issues, as they may arise on retrial.

## FACTS AND PROCEEDINGS

Appellants owned three waterfront parcels of property located at 910 South Bond Street, which together comprise the Property. The Property is approximately half an acre in size and is zoned M–3.[3]

On October 14, 1975, by Ordinance No. 999, the City approved an "Urban Renewal Plan" for Fells Point (the "Plan").[4] The Plan has been amended several times over the years. Of importance to this case, on November 17, 1989, the City approved Ordinance No. 412, amending the Plan by authorizing the City to acquire the Property in fee simple "by purchase or by condemnation, for urban renewal purposes . . . ." Ordinance 412 designated the Property "for public park use" only.

On November 21, 2002, thirteen years after Ordinance 412 was approved, the City instituted condemnation proceedings in the Circuit Court for Baltimore City pursuant to its quick-take authority. On that date, the City deposited into the registry of the court the sum of $260,000.00, representing the higher of two fair market value appraisals of the Property. Also on that

---

**3.** Section 7–401 of the Zoning Code of Baltimore City provides that "[t]he M–3 Industrial District is designed for industrial, manufacturing, and related activities generally known and described as 'heavy industry.' "

**4.** Article 13 of the Baltimore City Code ("BCC") authorizes the creation of urban renewal plans in Baltimore City. BCC § 2–5(b)(1) provides:
As used herein a Renewal Plan means a plan, as it exists from time to time, for the elimination, correction, or the prevention of the development or the spread of slums, blight, or deterioration in an entire Renewal Area or a portion thereof. . . .

date, the City petitioned for immediate possession and fee simple title of the Property. By order entered on November 27, 2002, the court granted the City's petition for possession of the property.

The City and appellants could not agree on the fair market value of the Property. Therefore, on June 9, 2004, the case came on for what would be a four-day jury trial to determine the fair market value of the Property.[5] After opening statements, the jury visited and viewed the Property, which by that time the City had converted into a public park.

The City then began its case-in-chief. Kimberly Clark, the Baltimore Development Corporation's East Team Director for Economic Development, testified to the location of the Property and areas surrounding it. She also described some improvements that were made to the Property after the institution of condemnation proceedings.

C. Gordon Gilbert, Jr. testified as an expert in commercial real estate appraisals. He testified that he inspected the Property in May 2002 and saw that its southeastern edge looked as if it had been "unprotected by any coherent bulkhead" and that the water had eroded some of that edge. He testified that he compared the sales of eight properties similar to the Property to determine its fair market value. His June 12, 2002 appraisal report was received in evidence. Mr. Gilbert opined, consistently with his report, that the Property had a fair market value of $260,000.00 in 2002.

Mr. Gilbert agreed that the Property is situated in an area that is "one of the hottest locations in" Baltimore. He testified that, as of the date of taking, other properties around the Property were zoned for certain commercial uses and that there was "a very high probability of th[e] [P]roperty being rezoned to" such commercial uses.

---

5. Maryland Rule 12–207(a) provides: "An action for condemnation shall be tried by a jury unless all parties file a written election submitting the case to the court for determination. All parties may file a written election submitting an issue of fact to the court for determination without submitting the whole action."

During Mr. Gilbert's testimony, the parties stipulated that, as of the date of taking, November 21, 2002, the Property had "frontage" on South Bond Street.

After Mr. Gilbert's testimony was concluded, appellants moved to strike all of it. Appellants argued, *inter alia,* that Mr. Gilbert's appraisal should have ignored the public park project, as required by RP § 12–105. The court denied the motion.

Calvin Thomas also testified for the City as an expert commercial real estate appraiser. Mr. Thomas testified that he visited the Property, which he described as "unimproved" and "eroding away into the water." Mr. Thomas's January 2002 appraisal report was received into evidence. Mr. Thomas testified, consistently with his report, that the fair market value of the Property was zero. Mr. Thomas also testified that, when he conducted his appraisal report, he assumed that the Property was landlocked.

At the conclusion of Mr. Thomas's testimony, appellants moved to strike Mr. Thomas's opinion of the fair market value of the Property. Appellants argued that it should be stricken because, *inter alia,* it was not given to a reasonable degree of certainty; he improperly considered the public park project; and he assumed that the Property was landlocked. The court denied the motion.

Laurie Feinberg, an employee in the Baltimore City Department of Planning, testified that one of the goals of the Plan is to ensure public access to the waterfront. Ms. Feinberg testified that, under the Plan, as amended in 1989, the Property could not be used to develop condominiums. She explained that, before development of condominiums on the Property could begin, the City would have to pass an ordinance authorizing such development.

Ms. Feinberg also testified that the 900 block of South Bond Street was a "paper street." She explained that a "paper street" "doesn't function as a street in that cars [do not drive on it,] but it's never been legally closed." She stated that, as far as she knew, the 900 block had "not been open to traffic."

Ms. Feinberg testified that an approximately twelve-foot frontage on the 900 block of South Bond Street would not comply with fire department requirements that a right of way be at least twenty feet in width to allow for fire truck traffic. Nor would the frontage comply with City requirements that a road handling vehicular traffic be at least forty feet in width. Road improvements allowing for any vehicular traffic, according to Ms. Feinberg, would have to be borne by the property owner. Ms. Feinberg also testified that the Plan mandated a twenty-foot waterfront promenade, meaning that anything done with the Property would have to account for twenty feet of open space for a public promenade.

The court accepted Ms. Feinberg as an expert in municipal planning. She opined, to a reasonable degree of certainty, that road improvements needed to comply with access requirements in this case could cost between $800,000.00 and $2,000,000.00.

Ms. Clark was then recalled to testify on behalf of the City. Over appellants' objection, she testified that the City spent approximately $2,600,000.00 to build the public park on the Property. The court received in evidence a document prepared by the Department of Transportation reflecting that cost.

After Ms. Clark's testimony, the City rested its case, and appellants began their case.

Alfred W. Barry, III testified as an expert in land planning. Mr. Barry testified that he had been employed in the City's Planning Department from 1972 until 1995, the last eight years of which he served as Assistant Planning Director. Mr. Barry was familiar with the Plan and the Property. He testified that the highest and best use of the Property was to build up to eighteen townhouses and eighteen marina slips. He opined, to a reasonable degree of certainty as an expert land planner, that, "had the City not ... designated th[e] [P]roperty to be acquired for a park, [ ] a development scheme for 18 houses ... would have been rezoned by the City and approved by the City." He further opined that it would have taken about six to nine months for the City to approve such a

development plan, and that a potential developer would think this amount of time reasonable.

Terry Duncan testified as an expert real estate appraiser. Mr. Duncan testified that, in consultation with Mr. Barry, he determined that the highest and best use of the Property would involve the development of eighteen town homes on it. He factored into his analysis a discount of fifteen percent based on the risk associated with real estate. He therefore determined that fifteen units and fifteen boat slips, rather than eighteen, would be a more appropriate estimate of what a developer could expect for the highest and best use. Mr. Duncan opined, to a reasonable degree of certainty as an expert real estate appraiser, that the fair market value of the Property as of the date of taking, ignoring the public project, was $1,950,000.00. The court received Mr. Duncan's appraisal report in evidence, but, at the City's behest and over appellants' objection, redacted two pages of the report that discussed a 2003 Maryland State Department of Assessment and Taxation ("SDAT") tax assessment.

Appellants then moved into evidence an SDAT tax assessment for 1988, which was in effect at the time Ordinance 412 was passed. The court refused to receive the tax assessment in evidence. The court did receive into evidence a copy of Ordinance 412.[6]

In lieu of calling Mr. Zografos to testify, the parties stipulated that if he were to testify, he would state "that he does not have any opinion as to the fair market value of the

---

**6.** Appellants informed the court that the City had agreed to redact from the appraisal reports of Mr. Gilbert and Mr. Thomas the SDAT tax assessment record in effect as of the date of taking. The appraisal reports have been made a part of the record on appeal. Page nine of Mr. Thomas's report includes a reference to the Property's having been assessed with a "full cash value" equal to the amount stated in the 2002 SDAT tax assessment. We assume, then, that the reference to the 2002 tax assessment was not redacted from the report. By statute, only the property owner may elect to present an SDAT tax assessment in a condemnation proceeding, "if the assessed value is greater than the appraised value placed on the property by the [City]." RP § 12–105(c).

[P]roperty other than what Mr. Duncan [ ] testified to." Appellants then concluded their case.

The jury returned an inquisition awarding $300,000.00 to appellants as just compensation for the Property.

We shall add facts as they become pertinent to our discussion.

## DISCUSSION

### I.

### *The City's Eminent Domain Authority*

We begin our analysis of appellants' claims by reviewing the City's power of eminent domain and its authority in quick-take condemnation proceedings.

▉ The City's eminent domain authority in this case is derived from Article III, § 40A of the Maryland Constitution, Title 12 of the Real Property Article, the Charter of Baltimore City, and CPLBC § 21–16. "Eminent domain, in its simplest terms, is the 'inherent power of a governmental entity to take privately owned property ... and convert it to public use....' " *J.L. Matthews, Inc. v. Maryland–National Capital Park & Planning Comm'n,* 368 Md. 71, 87, 792 A.2d 288 (2002) (quoting BLACK'S LAW DICTIONARY 541 (7TH ed. 1999)); *see also County Comm'rs of Frederick County v. Schrodel,* 320 Md. 202, 215, 577 A.2d 39 (1990) (stating that the sovereign needs no constitutional authority to enjoy the power of eminent domain).

▉ A governmental entity's power of eminent domain is subject to limitations under "Article III, § 40 of the Maryland Constitution, together with the Fifth and Fourteenth Amendments to the United States Constitution ...." *J.L. Matthews,* 368 Md. at 87, 792 A.2d 288.[7] These provisions limit

---

7. Article III, § 40 of the Maryland Constitution provides:

The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as

the sovereign's authority "by requiring that the taking of private property by governmental entities 'be for public use and that just compensation be paid.'" *Id.* (citations omitted). *See also Schrodel,* 320 Md. at 215, 577 A.2d 39. Moreover, the General Assembly has exclusive discretion over "[t]he mode and manner of the exercise of the power of eminent domain[.]" *J.L. Matthews,* 368 Md. at 87, 792 A.2d 288 (citations and internal quotation marks omitted).

## II.

### *Diminution in Value Evidence*

Before trial, the City filed a motion *in limine* to preclude appellants from introducing two tax assessments from SDAT: one performed in December 1987 and effective July 1, 1988, seventeen months before the City approved Ordinance 412 in 1989; and one performed in January 2003 and effective July 1, 2003, several months after the City instituted condemnation proceedings in November 2002. The City argued that appellants could introduce evidence of the SDAT tax assessment in effect on the date of the taking, *i.e.,* November 21, 2002, but not any other tax assessment, because no other assessment was relevant to the fair market value of the Property as of the date of taking.

Appellants countered that RP § 12–105(c) explicitly authorizes a property owner, in certain circumstances, to introduce an SDAT tax assessment. They argued that the statute does not limit a property owner to use of only the tax assessment in effect on the date of taking. They argued, moreover, that the

---

agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation.

The Fifth Amendment to the United States Constitution provides, in pertinent part: "nor shall private property be taken for public use, without just compensation." The "takings clause" of the Fifth Amendment is made applicable to the States through the due process clause of the Fourteenth Amendment. *Mercantile–Safe Deposit & Trust Co. v. Mayor & City Council of Baltimore,* 308 Md. 627, 640 n. 3, 521 A.2d 734 (1987) (citing *Chicago B & Q R'd Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897), and *King v. State Roads Comm'n,* 298 Md. 80, 83, 467 A.2d 1032 (1983)).

1989 and 2003 tax assessments are relevant to the determination of whether Ordinance 412 caused a diminution in the value of the Property.

The court granted the City's motion *in limine*. The court determined that, although the statute did not identify which tax assessments are relevant, the statute implies that the only relevant assessment is the one in effect on the date of taking, because that date is the only date relevant to a jury's determination of just compensation.

During trial, the court denied appellants' attempt to elicit from their expert appraisal witness, Mr. Duncan, evidence of a diminution in the value of the Property proximately caused by Ordinance 412:

[Appellants' counsel:] Okay. And additionally, Mr. Duncan, ... are you aware of the definition of fair market value that provides for a consideration of diminution in value between the date of legislative enactment and the date of take?

[Mr. Duncan:] Yes, I am.

[Appellants' counsel:] And briefly what is your understanding of that provision?

[Mr. Duncan:] Well, basically what it provides for is if there's a, an announcement of the public project and the property is not taken until sometime later, that if the property deteriorates in value, deteriorates in some form or fashion, that the property owner's entitled to compensation for that.

[Appellants' counsel:] And, and based on your investigation of the subject property and knowing what you, and knowing that the announcement [of the public park project] and the effective legislation was in 1989, did you find there to be any evidence of a diminution in value between 1989 and November of 2002?

[The City's counsel]: Objection.

The Court: Sustained.

The court received Mr. Duncan's appraisal report, but, over appellants' objection, redacted the references in it to the 2003 property tax assessment. The court also refused to admit the 1988 property tax assessment, when offered by appellants.

Appellants challenge the court's exclusion of the 1988 and 2003 tax assessments as well as Mr. Duncan's expected testimony on diminution of value. They argue that both tax assessments and Mr. Duncan's testimony are relevant to establish that the value of the Property diminished as a result of the enactment of Ordinance 412.

Appellants did not proffer what Mr. Duncan's testimony would have been. Generally, "the question of whether the exclusion of evidence is erroneous and constitutes prejudicial error is not properly preserved for appellate review unless there has been a formal proffer of what the contents and relevance of the excluded testimony would have been." *Mack v. State*, 300 Md. 583, 603, 479 A.2d 1344 (1984).

The City makes no argument that appellants have not properly preserved for appellate review the admissibility of Mr. Duncan's diminution-of-value testimony. At oral argument before us, appellants' counsel stated that he had made plain to the circuit court exactly what Mr. Duncan's testimony on the issue would have been. The record does not support that representation, however.

We shall not speculate about all of what Mr. Duncan might have said on the subject of diminution in value. Nevertheless, given that the City makes no argument of non-preservation and that the record indicates that Mr. Duncan would have testified, at the least, about the 2003 tax assessment and likely about the 1988 assessment as well, we shall address whether the court committed prejudicial error by precluding evidence of both assessments, whether through Mr. Duncan, his report, or the assessments themselves.

We begin by recognizing that the jury's role in condemnation cases is to "resolve[ ] factual disputes relating *only* to just compensation and [to] fix[ ] the amount of compensation." *Utilities, Inc. of Maryland v. Washington Suburban*

*Sanitary Comm'n,* 362 Md. 37, 48, 763 A.2d 129 (2000) (emphasis added). This task requires the jury to determine the "fair market value" of property in a quick-take condemnation proceeding. *Bern–Shaw Ltd. P'ship v. Mayor & City Council of Baltimore,* 377 Md. 277, 288, 833 A.2d 502 (2003); *see also* RP § 12–104(a) (providing that "[t]he damages to be awarded for the taking of land is its fair market value").

RP § 12–105(b) defines fair market value as follows:

The fair market value of property in a condemnation proceeding is *the price as of the valuation date* for the highest and best use of the property which a vendor, willing but not obligated to sell, would accept for the property, and which a purchaser, willing but not obligated to buy, would pay, excluding any increment in value proximately caused by the public project for which the property condemned is needed. *In addition, fair market value includes any amount by which the price reflects a diminution in value occurring between the effective date of legislative authority for the acquisition of the property and the date of actual taking if the trier of facts finds that the diminution in value was proximately caused by the public project for which the property condemned is needed, or by announcements or acts of the plaintiff or its officials concerning the public project, and was beyond the reasonable control of the property owner.*

(Emphasis added.)

 Under RP § 12–105(b), two dates are relevant to the question of diminution in value. The first is "the effective date of legislative authority for the acquisition of the property," which, under RP § 12–105(a), "means, with respect to a condemnor vested with continuing power of condemnation, the date of specific administrative determination to acquire the property." The second is the "valuation date" for establishing fair market value.

 Ordinance 412, approved on November 17, 1989, authorized the taking of the Property for the purpose of building a public park. Ordinance 412 provides, moreover, that it was

passed to authorize the City to acquire the Property in fee simple "by purchase or by condemnation, for urban renewal purposes . . . ." Plainly, the date of approval of Ordinance 412, November 17, 1989, constitutes the effective date of legislative authority for the acquisition of the Property.

■ The "valuation date" for purposes of determining fair market value of the Property is November 21, 2002. That is the date the City commenced formal quick-take condemnation proceedings in the circuit court and deposited $260,000.00 into the court's registry. *See Bern–Shaw*, 377 Md. at 282, 833 A.2d 502; RP §§ 12–102, 12–103.

■ The time period for purposes of diminution in value is the thirteen years between November 17, 1989, and November 21, 2002.

Appellants maintain that both the 1988 and 2003 tax assessments were admissible under RP § 12–105(c), and that they were relevant to show a diminution in value, which was proximately caused by the approval in 1989 of Ordinance 412. Appellants argue that the General Assembly, by enacting RP § 12–105(c), intended that any SDAT tax assessment, without regard to its date, is admissible if offered by a defendant property owner, so long as the assessed value exceeds the condemning authority's appraisal value.

The City responds that RP § 12–105(c) only contemplates as relevant a tax assessment that is in effect as of the taking date. At oral argument before us, however, the City conceded that a tax assessment for a time period before the taking date may be relevant to diminution in value. The City argued, however, that appellants did not establish the relevance of the 1988 and 2003 assessments. The City asserts, moreover, that the court properly refused to receive the 1988 SDAT tax assessment because the City did not have the benefit of deposing or cross-examining the official who conducted the assessment. The City also argues that, even if the court erred, appellants were not substantially prejudiced by the error; therefore, the jury's inquisition should not be disturbed.

■ The general rule in condemnation proceedings is that a property tax assessment " 'made by public authorities for purposes of taxation is not admissible in condemnation proceedings.' " *E.L. Gardner, Inc. v. Bowie Joint Venture,* 64 Md.App. 302, 308, 494 A.2d 988, *cert. denied,* 304 Md. 296, 498 A.2d 1183 (1985) (quoting *Baltimore City v. Himmel,* 135 Md. 65, 75–76, 107 A. 522 (1919)).[8] It has been said that "[a] common rationale for the [ ] rule . . . is that it is common knowledge that [tax] assessors do not assess property at market value, and that such valuations are made for a purpose other than determination of true or market value." C.C. Marvel, *Valuation for taxation purposes as admissible to show value for other purposes,* 39 A.L.R.2d 209 § 7 (1955) (footnote omitted).

RP § 12–105(c), however, explicitly provides for instances when a defendant property owner, in a condemnation proceeding, may present evidence of the assessed value of the condemned property. Subsection (c) states:

> The defendant property owner may elect to present as evidence in a condemnation proceeding, the assessed value of the property, as determined by the Department of Assessments and Taxation, if the assessed value is greater than the appraised value placed on the property by the condemning authority.

We have found no cases interpreting the language of this subsection. We thus have the task of construing it.

■ " '[T]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the [legislative body].' " *Motor Vehicle Admin. v. Jones,* 380 Md. 164, 175, 844 A.2d 388 (2004) (quoting *Holbrook v. State,* 364 Md. 354, 364, 772 A.2d 1240 (2001)). The analysis begins with the language of the statute itself. *Western Corr. Inst. v. Geiger,*

---

**8.** *Himmel, supra,* 135 Md. 65, 107 A. 522, is a condemnation case that predates by over forty years the enactment of the language in Article 33A, § 6, the predecessor to RP § 12–105(c), authorizing a condemnee to introduce evidence of a tax assessment. *See* 1966 Laws of Maryland Ch. 149.

371 Md. 125, 141, 807 A.2d 32 (2002). We assign words in a statute their ordinary and natural meaning. *O'Connor v. Baltimore County,* 382 Md. 102, 113, 854 A.2d 1191 (2004). "[S]tatutory language is not read in isolation, but 'in light of the full context in which [it] appear[s] ...'" *Knight v. Princess Builders, Inc.,* 162 Md.App. 526, 531, 875 A.2d 771 (2005) (citations omitted). "If the plain language of the statute is unambiguous and is consistent with the statute's apparent purpose, we give effect to the statute as it is written." *Comptroller of the Treasury v. Phillips,* 384 Md. 583, 591, 865 A.2d 590 (2005).

The appellate court "will look 'beyond the statute's plain language in discerning the legislative intent' only where the statutory language is ambiguous." *Jones,* 380 Md. at 176, 844 A.2d 388 (citation omitted). Language in a statute is ambiguous if there is more than one reasonable interpretation of it. *Phillips,* 384 Md. at 591, 865 A.2d 590. "If the statutory language is ambiguous or unclear, we look to legislative history, prior case law, and statutory purpose." *Id.*

Applying these rules of construction, we note at the outset that subsection (c) does not expressly preclude a property owner from presenting evidence of a tax assessment other than the assessment in effect at the time of taking. Furthermore, when subsection (c) is read in the context of the remainder of RP § 12–105, it is plain that a property owner is not precluded from presenting other tax assessments, so long as the assessed value exceeds the condemning authority's appraisal.

RP § 12–105(b) states that fair market value of property in a condemnation proceeding "includes any amount by which the price reflects a diminution in value occurring between the effective date of legislative authority for the acquisition of the property and the date of actual taking if the trier of fact finds that the diminution in value was proximately caused by the public project for which the property condemned is needed[.]"

■ Subsection (c), in turn, authorizes a property owner to present evidence of the assessed value of the condemned property, if the assessed value is higher than the condemning authority's appraisal. Read together with subsection (b), subsection (c) reflects the General Assembly's intent to give a property owner the ability to counter a condemning authority's appraisal value, which constitutes the condemning authority's opinion of fair market value, with evidence that, at a time relevant to the determination of fair market value, the State assessed the property at a higher value. We conclude that RP § 12–105(c) does not limit its applicability only to the assessment that is current as of the time of the taking.

■ The Property was assessed by the SDAT in 1988 at a value of $528,810.00, more than 100 percent higher than the City's higher appraisal of $260,000.00, made some months before the actual taking in 2002. Seventeen months after the July 1, 1988 effective date of the 1988 tax assessment, the City enacted Ordinance 412, authorizing the taking of the Property.

The 1988 assessment satisfies the criterion for admissibility set forth in RP § 12–105(c), because it is higher (indeed far higher) than the appraisal. That alone does not guarantee the admissibility of the 1988 assessment, however. The assessment must pass the threshold of relevance. *See* Md. Rule 5–402.

■ Pertinent to our determination of whether the 1988 tax assessment is relevant are two evidentiary propositions: (1) "no evidence that is alleged to relate to the fair market value of a property involved in a condemnation proceeding is properly admissible at trial unless it is actually relevant"; and (2) "[t]he general rule in this State is that all evidence that is relevant to a material issue is admissible except as otherwise provided by statutes or by rules applicable in Maryland courts." *Bern–Shaw,* 377 Md. at 289–90, 833 A.2d 502 (citations and internal quotation marks omitted). *See also* Md. Rule 5–402. We review a trial court's rulings on the admissibility of evidence under two very different standards. When a court's ruling involves "a discretionary weigh-

ing of relevance in relation to other factors," we review the ruling on an abuse of discretion standard. *Bern–Shaw,* 377 Md. at 291, 833 A.2d 502. If the court's ruling is a purely legal issue, we review the ruling *de novo. Id.*

In the present case, the court stated that it granted the City's motion *in limine* because RP § 12–105(c) implied that the only relevant tax assessment is the assessment in effect at the time of the taking. We have concluded that the statute permits other tax assessments to be presented by the property owner, so long as the statutory criterion is met. The court's refusal to permit appellants to place into evidence the 1988 tax assessment was based on a misreading of the statute and was, therefore, legally wrong.

Because the court decided the issue as it did, it did not reach the question whether the 1988 tax assessment was relevant to the question of the value of the Property on the date of taking. We are satisfied that, on this record, the 1988 tax assessment was relevant to establish that the enactment of Ordinance 412 proximately caused a diminution in the value of the Property. *Cf. Mayor & City Council of Baltimore v. United Five & Ten Cent Stores, Inc.,* 250 Md. 361, 243 A.2d 521 (1968) (construing former Maryland Code (1967 Repl. Vol.), Article 33A, § 6, the predecessor to RP § 12–105(c), as allowing the jury in a condemnation proceeding to consider, as evidence of diminution in value, an ordinance that pre-dated the ordinance that authorized the taking of the property, because the earlier ordinance constituted an announcement by public officials concerning the property that could have proximately caused a diminution in value of the property).

The City urges that, even if the court erred in disallowing evidence of the 1988 tax assessment, appellants were not substantially prejudiced by the ruling and, therefore, are not entitled to a retrial. The City relies on *State Roads Comm'n v. Kuenne,* 240 Md. 232, 213 A.2d 567 (1965), as support for its argument.

The City's reliance on *Kuenne, supra,* is misplaced. In *Kuenne,* the Court of Appeals held that the trial court erred

when it denied the condemnor's motion to strike the testimony of a landowner that he based his estimate of the property's value on a purchase "offer." *Id.* at 235, 213 A.2d 567. The Court then analyzed whether the condemnor was prejudiced by the landowner's testimony, and determined that reversal was not warranted. The Court recognized that the level of prejudice that must be shown to reverse a jury's inquisition must be substantial:

"Courts are reluctant to set aside verdicts for errors in the admission or exclusion of evidence unless they cause substantial injustice. This is especially true in condemnation proceedings. Such cases usually consume much time in trial and are expensive in nature. As a rule, they are determined by a myriad of different items of evidence. The exclusion or admission of small items of evidence of doubtful materiality are not likely to be of great importance in the outcome of the case, and most courts refuse to set aside a verdict in cases of this kind, for error in the rulings on questions of evidence, unless, as indicated above, substantial prejudice be shown."

*Id.* (quoting *Hance v. State Roads Comm'n,* 221 Md. 164, 176, 156 A.2d 644 (1959)).

Applying the test of substantial prejudice, the *Kuenne* Court noted that the actual inquisition returned by the jury was only slightly higher than the market value fixed by the expert witnesses. The Court also found persuasive that, at the time of the taking, it was difficult to state the fair market value of the property with certainty. The Court noted, however, that if the jury's award had been closer to the amount testified to by the landowner (which would have indicated that the testimony influenced the jury), then the error in admitting the testimony would have been prejudicial to the condemnor. *Id.* at 235–36, 213 A.2d 567.

*Kuenne* is easily distinguishable from this case. *Kuenne* did not involve error that resulted in a party's inability to present evidence that is expressly permitted by statute. Moreover, in *Kuenne,* the Court could safely conclude that no

prejudicial error resulted from the jury's hearing the inadmissible testimony, because the jury returned an inquisition that was not even close to the landowner's inadmissible testimony of fair market value.

In the present case, the jury returned an inquisition close to the highest value presented by the City and, conceivably, far lower than an inquisition that could have been returned had the jury heard testimony supporting appellants' diminution in value theory. For this reason, we hold that appellants were substantially prejudiced by the court's exclusion of the 1988 tax assessment. Our holding requires that the judgment reflecting the jury's valuation be vacated, and the case be remanded for a new trial.

The court did not err or abuse its discretion, however, in refusing to permit appellants to introduce the 2003 SDAT tax assessment, which valued the Property at $661,800.00. We explain.

Throughout most of the trial, appellants maintained that the date of taking in this case was November 21, 2002. Deep into their case, however, relying on testimony of a City witness that the City did not actually enter the Property and take it until after February 2003, appellants asserted that the taking date was not until sometime after January 1, 2003. On this premise, appellants sought admission of the 2003 tax assessment because it was the first assessment made after the City actually began constructing the public park.

RP § 12–105(c) does not contemplate introduction of the 2003 tax assessment, on the facts of this case. As we have said, RP § 12–105(c) authorizes a defendant property owner to elect to present evidence of a tax assessment that is higher than the condemning authority's appraisal value for the purposes of determining fair market value. We stated earlier in this opinion that the date of taking in this case is November 21, 2002. The 2003 tax assessment does not come within the statute because it was conducted after the date of taking and therefore had no bearing on any diminution in value that

occurred between the date of legislative enactment authorizing the taking of the property and the actual date of taking.

## III.

### *The Witnesses' Testimony*

Appellants argue that the court erred in refusing to strike the testimony of Ms. Clark and the opinions of the City's expert appraisers. The City responds that the court properly admitted the testimony of Ms. Clark because her testimony was relevant to the issue of improving the Property. Regarding the expert appraisers' testimony, the City argues that the court did not err because, in expressing an opinion of fair market value, both experts indicated that the designation of the Property for a public park "was not a factor in their consideration." We consider each argument in turn.

Through the testimony of Ms. Clark and others, the City presented evidence of post-taking "improvements" made to the property in connection with Ordinance 412. Ms. Clark testified that the improvements cost the City "roughly $2.6 million." Ms. Clark's testimony concerning the cost to improve the Property to construct a public park was inadmissible.

When determining what constitutes just compensation for condemned property, the jury "must disregard the effect of the public project[ ] for which the property is acquired[.]" *Bonaparte v. Mayor & City Council of Baltimore,* 131 Md. 80, 83, 101 A. 594 (1917) (holding that a valuation of condemned property must consider all potential uses of the property). Furthermore, a valuation of condemned property that takes into account the pending condemnation is inadmissible. *See Congressional School of Aeronautics, Inc. v. State Roads Comm'n,* 218 Md. 236, 249–50, 146 A.2d 558 (1958) (excluding the testimony of a witness who, when estimating the market value of condemned property, considered the limited time that a prospective buyer would be able to use the property before it would be taken for highway widening). These cases reflect the principle that the effect of the public

project should be ignored in calculating fair market value. That principle has been codified in what is today RP § 12–105(b), which specifically provides that the determination of fair market value should "exclud[e] any increment in value proximately caused by the public project for which the property condemned is needed."

Turning to this case, the jury's task was to determine the fair market value of the Property. The "increment in value proximately caused" by the public project, *i.e.*, the park, was to be excluded from that determination. Yet the City, rather than ignoring the public project, put before the jury the testimony of Ms. Clark that $2.6 million was spent to "improve" the Property. The City does not identify any authority, and we have found none, that supports the admissibility of evidence of the cost to improve property in furtherance of a public project after the condemning authority has taken the property for public use. To the contrary, the above authorities support appellants' position that such evidence is inadmissible. On retrial, the City should not be permitted to introduce evidence of the cost to the City of its improvements to the Property.

We turn now to the testimony of the City's expert appraisers, Mr. Gordon and Mr. Thomas. Appellants argue that the court erred in refusing to strike those witnesses' testimony because they each considered the designation of the Property for public park use only in rendering an opinion of the Property's fair market value. The City responds that both experts indicated by their testimony that they did not factor into their analysis the designation of the Property for public park use.

Only relevant evidence is admissible at trial. *See* Md. Rule 5–402. "[I]n order for an expert's appraisal to have any relevance, it must be in accordance with the statutory definition" of fair market value. *Stickell v. Mayor & City Council of Baltimore*, 252 Md. 464, 473, 250 A.2d 541 (1969).

We do not agree with appellants' interpretation of the experts' testimony. Mr. Gilbert's opinion that the fair market value of the Property was approximately $260,000.00 was derived from the report he had prepared. That report included a reference to the Property having been designated for use as a public park.

At the conclusion of Mr. Gilbert's testimony, appellants moved to strike it, arguing that his response to a question posed by the court reflected that he did not exclude any increment in value proximately caused by the public park project. The court denied the motion to strike any of Mr. Gilbert's testimony, having concluded that Mr. Gilbert's opinion was evidently unaffected by his knowledge that the Property was designated by the City for public park use only.

We have reviewed Mr. Gilbert's testimony and his report, and we discern nothing in either that called into question the admissibility of his opinion of the fair market value of the Property, or required that his testimony should have been excluded in all or in part. It seems to us that appellants' arguments for striking Mr. Gilbert's testimony go to the weight of it, not its admissibility.

The court likewise did not err in refusing appellants' request to strike the opinion of Mr. Thomas. Mr. Thomas testified that, in his opinion, the Property had no fair market value because it would have cost more to develop the Property than what one could profit from the development. When asked whether his opinion of fair market value would be different if the City had never designated the Property for public park use only, Mr. Thomas testified that he would have reached the same conclusion because of, *inter alia*, the condition of the Property. Again, appellants' arguments go to the weight of Mr. Thomas's testimony, not to its admissibility.

**IV.**

### *The Jury Instructions*

Appellants argue that the court erred in refusing to give two of their proposed instructions concerning the irrelevance of the public park project to the determination of fair market

value of the Property. Appellants concede that the instructions given properly state the law. They assert, however, that the court erred because "nothing in the [court's] instruction[s] addressed the requirement that the jury should disregard the effect of the public park project and the fact of the authorizing ordinance."

The City responds that the court properly instructed the jury on the applicable law. The City asserts that the instructions given by the court "mirrored," "almost verbatim," the statutory definition of fair market value. The City also argues that the court committed no error under Maryland Rule 2–520(c).

Maryland Rule 2–520(c) governs jury instructions and provides: "The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given." *See also Boone v. American Mfrs. Mut. Ins. Co.,* 150 Md.App. 201, 225, 819 A.2d 1099 (2003) (stating "a trial court must properly instruct the jury on a point of law that is supported by some evidence in the record"), *cert. denied,* 376 Md. 50, 827 A.2d 112 (2003).

When we review a trial court's ruling to grant or deny a requested jury instruction, we consider " 'whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given.' " *Burdette v. Rockville Crane Rental, Inc.,* 130 Md.App. 193, 212, 745 A.2d 457 (2000) (citations omitted). "[S]o long as the law is fairly covered by the jury instructions, reviewing courts should not disturb them." *Farley v. Allstate Ins. Co.,* 355 Md. 34, 46, 733 A.2d 1014 (1999).

In the present case, the court instructed the jury regarding its assessment of fair market value as follows:

The fair market value in a condemnation proceeding is the price as of the valuation date, November 21, 2002, for what we call the highest and best use of the property, which a seller, willing but not obligated to sell, would accept for the property and which a purchaser, willing but not obligated to buy, would pay excluding any increment in value proximately caused by the public project for which the property is condemned.

The highest and best use of the property is the most profitable potential use the property has on the date of taking. In addition, I would say to you that what we mean when we say fair market value includes any amount by which the price reflects a diminution in value occurring between the effective date of the legislative authority for the acquisition of the property and the date of the actual taking. If you find that the diminution in value was proximately caused, if you find any diminution in value at all, and if you find that such diminution in value as you might find was proximately caused by the public project for which the property condemned is needed, or by announcements or acts of the Plaintiff, the Plaintiff being the [City], the condemning authority, or any of its officials concerning the public property or public project rather, and it was beyond the reasonable control of the property owners.

The court's instructions essentially mirrored the statutory definition of fair market value in condemnation cases. *See* RP § 12–105(b). The instruction given was "a correct exposition of the law."

 Appellants asked the court to add to those instructions the following instructions:

In determining the fair market value of the property as of the date of value, you must consider all the uses to which the property could have been applied as if the public project was neither announced, planned or constructed, and you must award the defendants what you believe would have been the property's fair market value under the circumstances mentioned, if employed for the most profitable use

for which you find it could have been applied, whether in fact applied to such use or not. In other words, in determining fair market value, you must disregard the effect of the public project, for which the property was acquired, but must take into consideration all the uses to which the property is (or was) capable of being applied at the time of the taking in November 2002.

You are instructed that, when these instructions refer to the "public project," this means the preparation of the land, fastland and bulkheads for, and construction of, a public park on the subject property located at 910 South Bond Street.

You are further instructed that, when these instructions refer to the "effective date of legislative authority for the acquisition of the property" this means the approval of [Ordinance 412] in November 1989, which both designated the subject property as permitting only public park use and authorizing the City to acquire the subject property for that public project.

We have said that the jury's role in condemnation cases is to resolve factual disputes relating to compensation and to determine the amount of compensation. *See Utilities,* 362 Md. at 48, 763 A.2d 129. The requested instructions would have likely aided the jury in understanding the case and the applicable law.

Indeed, the requested instructions incorporated the evidence presented to the jury and directly complied with long-standing legal principles governing condemnation cases. *See Brinsfield v. Mayor & City Council of Baltimore,* 236 Md. 66, 73, 202 A.2d 335 (1964) (stating that where a "property was condemned for the purpose of clearing a so-called slum area," "the jury should not consider either increase or diminution in the value because of the use to which the property is to be put"); *Congressional School of Aeronautics, Inc.,* 218 Md. at 249–50, 146 A.2d 558 (stating "that evidence of value based upon the effect of the taking involved in a pending condemnation suit is inadmissible," and holding that the opinion of the

condemning authority's expert appraiser concerning market value should have been struck because it was based, in part, "upon the limited time for which a prospective, willing purchaser might be able to use the property because of the prospect of its being taken for the highway widening which gave rise to this suit"); *Bonaparte*, 131 Md. at 83, 101 A. 594 (stating that, in determining fair market value, a jury should consider the uses for which a property can be applied without regard to whether that use has been applied, and that the jury "must disregard the effect of the public project, for which the property is acquired, but must take into consideration all the uses to which it is capable of being applied at the time of the appropriation and which affect its marketability").

Because we are vacating the judgment on other grounds, we need not decide whether the court committed reversible error by refusing to give the additional instructions requested by appellants. We note, however, that the court would not have abused its discretion (and perhaps would have taken the better course of action) by instructing the jury not to consider the effect of the public project in determining the value of the Property.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY, AND THE INQUISITION UPON WHICH IT IS BASED, VACATED. CASE REMANDED FOR NEW TRIAL.**

**COSTS TO BE PAID BY THE MAYOR & CITY COUNCIL OF BALTIMORE.**